IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AHMED ALASADY,

      Plaintiff,

      v.                        1:25-cv-00058-KG-KK

FRANK J. BISGNANO[1], Commissioner
of the Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[2]**

Plaintiff Ahmed Alasady ("Claimant") asserts his entitlement to Disability Insurance

Benefits ("DIB") claiming he has been disabled since 2012. The Commissioner disagrees based

on the Administrative Law Judge's conclusion that Claimant's impairments or combination of

impairments do not significantly limit his ability to perform basic work-related activities. Claimant

now appeals asserting error in the ALJ's step-two analysis and asks the Court to remand this matter

to the Social Security Administration for further proceedings. Having meticulously reviewed the

entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set

forth below, I propose to find that the ALJ committed harmful error in his step-two determination

---

[1] Frank J. Bisgnano was confirmed as the Commissioner of the Social Security Administration on May 6, 2025, and is automatically substituted as a party under 42 U.S.C. § 405(g) and Federal Rule of Civil Procedure 25(d)

[2] By an Order of Reference (Doc. 18) entered on September 9, 2025, United States District Judge Kenneth J. Gonzales referred this case to the undersigned to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

and recommend that the Court reverse the Commissioner's decision denying benefits, and remand this matter to the Commissioner for further proceedings consistent with this opinion.

## I.   FACTUAL AND PROCEDURAL HISTORY

Between 2008 and 2012, Claimant worked as a "language and culture advisor[]" for three contractors that provided services to the United States Army including in Iraq, Kuwait, and at Guantanamo Bay. (AR[3] 47-48, 191-194.) He filed a claim for disability insurance benefits on March 7, 2023, alleging a period of disability beginning on April 1, 2012, due to post-traumatic stress disorder ("PTSD") and frequent urination. (AR 172-175.) The Social Security Administration ("SSA") denied his claim at the initial level on June 5, 2023, and at the reconsideration level on September 22, 2023. (AR 77-81, 90-93.) When Claimant requested reconsideration, he added that he had a "neck and back injury throughout the years of 2003-2012" that was not listed on his initial application. (AR 247.) Claimant requested a hearing, which Administrative Law Judge ("ALJ") Michael Leppala held on July 31, 2024. (AR 38-64, 98.) On August 16, 2024, the ALJ issued a decision finding that Claimant is not disabled under the relevant sections of the Social Security Act. (AR 17-33.) On November 15, 2024, the Appeals Council denied Claimant's request for review, which made the ALJ's decision the final decision of the Commissioner. (AR 1-4); *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

On May 30, 2025, Plaintiff filed his Motion to Remand (Doc. 13.) ("Motion") asking the Court to reverse the ALJ's decision and remand this matter to the Commissioner for further proceedings. (Doc. 13.) On July 29, 2025, the Commissioner filed a response to Claimant's Motion. (Doc. 16.) Claimant did not file a reply in support of his Motion. (*See* Doc. 17.)

---

[3] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on December 12, 2024. (Doc. 12.)

## II.   THE ALJ DECISION

On April 3, 2024, Claimant requested, prior to the administrative hearing, that the ALJ obtain a medical expert. (AR 163.) Claimant explained in the request that he had received medical treatment in Iraq and Mexico between 2012 and 2022 because he worried that seeking treatment in the United States would impact his security clearance. (AR 163.) He explained, however, that he had been unable to obtain any records related to his treatment because records were not adequately kept where he received it. (AR 163.) As a result, Claimant requested that a medical expert or consultant determine the extent of his PTSD and related symptoms prior to his date last insured. (AR 163.) The ALJ, however, denied Claimant's request, holding that:

> State agency medical consultants in prior administrative medical findings already considered available evidence that dates prior to the date last insured. Another medical opinion would be duplicative, and more recent examination findings would not be relevant to the Claimant's functioning prior to the date last insured.

(AR 20.)

After the hearing, the ALJ reviewed Claimant's claim pursuant to the five-step sequential evaluation process.[4] (AR 21-22.) First, the ALJ found that Claimant had not engaged in substantial

---

[4] The five-step sequential evaluation process requires the ALJ to determine whether:

(1) the claimant engaged in substantial gainful activity during the alleged period of disability;
(2) the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3) any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4) the claimant can return to his or her past relevant work; and, if not,
(5) the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis, and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

gainful activity since his onset date of April 1, 2012, through December 31, 2017, the date Claimant last met the earning requirements to be eligible for disability benefits (i.e., "the date last insured"). (AR 22-23, 185-190.) The ALJ found at step two that Claimant had the following medically determinable impairments: 1) hearing loss, 2) urinary incontinence, 3) depression, and 4) PTSD. (AR 23.) The ALJ further found that Claimant's alleged neck and back injury were "not supported by any abnormality of record." (AR 23.) The ALJ concluded that Claimant's impairments or combination of impairments did not "significantly limit[ ] the ability to perform basic work-related activities for 12 consecutive months" before the date last insured and therefore were not severe. (AR 23.) As such, the ALJ concluded that Claimant was not disabled and did not proceed to steps three through five of the five-step test. (AR 23-28.)

### III.    Evidence Regarding Claimant's Impairments

The Administrative Record contains few medical records from 2012-2017. (AR 1F-11F.) However, Claimant testified that he sought treatment outside the United States because he worried about the impact of the diagnosis of and treatment for PTSD impacting his security clearance. (AR 48-49.) Claimant explained that he received treatment in Mexico, Iraq, Kuwait, and in the facility at Guantanamo Bay, where he last worked in 2012, and the records were either lost or not kept. (AR 44, 48-49, 58.) For example, Claimant testified that he contacted the contracting clinic that provided him treatment at Guantanamo Bay, which informed him that his records had been sent to the National Archives. (AR 58.) Claimant further testified that when he contacted the National Archives, he was told that records were not kept for more than 7 years and that it had no records of his treatment. (AR 58.)

Claimant received treatment in Michigan for reported urinary incontinence in 2011 and 2012. (AR 303-331.) On July 21, 2011, Claimant received outpatient procedures, including a

cystometrogram and cystoscopy, after reporting that he urinated approximately once per hour during the day and 6 to 7 times during the night. (AR 304.) The treatment records indicate that Claimant voided without difficulty, there was no evidence of dysuria or hematuria, and that he had no history of cholelithiasis. (AR 304.) The procedures revealed a healthy bladder mucosa and "no evidence of bladder tumor, diverticulum or stone." (AR 306.) The treating physician made a post-procedure diagnosis of an "overactive bladder." (AR 318.) On April 16, 2012, Claimant underwent a kidney ultrasound, that revealed a simple cyst at his left kidney. (AR 329.) The ultrasound revealed no hydronephrosis and no renal calculi. (AR 329.) Other procedures during 2011 and 2012 included numerous laboratory exams, often testing various hormone levels of Claimant. (AR 331-360.) Claimant also received prescriptions for his overactive bladder in Iraq in 2014. (AR 394-396.) In 2014, a urologist, Dr. Kafaji, prescribed Claimant several medications including Ditropan[5]. (AR 394-95.)

In 2014, Claimant received treatment for PTSD and depression in Iraq with Dr. Ameer Ali. (AR 393, 397.) Dr. Ali prescribed Claimant tryptizol,[6] sertraline,[7] and a third prescription that is not legible. (AR 393.) Dr. Ali stated, at the top of the prescriptions, "PTSD with depressive

---

[5] The Court takes judicial notice of the properties of prescription medication from the Physicians' Desk Reference, which identifies Ditropan as an antimuscarinic agent with some antispasmodic actions, used for overactive bladder. *See Purkey v. Green*, 28 F. App'x 736, 742 n.4 (10th Cir. 2001) (taking judicial notice of the properties of prescription medication from the Physicians' Desk Reference).

[6] The Physicians' Desk Reference identifies amitriptyline (which as indicated in Dr. Ali's notes is a brand of tryptizol) as tertiary amine tricyclic antidepressant used for treatment of depression.

[7] The Physicians' Desk Reference identifies sertraline, also known as Zoloft, as selective serotonin reuptake inhibitor (SSRI) antidepressant indicated for depression, OCD, panic disorder, PTSD, social anxiety disorder, and PMDD in adults.

symptoms." (AR 393.) On December 2023, Dr. Ali drafted a letter describing his 2014 treatment of Claimant.[8] (AR 397.) Dr. Ali's letter reads, in entirety:

> [Claimant, a] 36-year-old male patient presented to outpatient clinic in May 2014 with severe symptoms of major depressive disorder. He complains of low mood, lack of energy, sleep disturbances, isolation from other people loss of weight disturbed memory, hopelessness and helplessness, feeling of generalized anxiety and integration difficulty with his environment accompanied with urine incontinence. [Claimant] was diagnosed with PTSD. He was placed on antidepressant medications Tryptizol (amitriptyline) 25 mg at night and Zoloft (sertraline) 50mg at morning. [Claimant] needs continuous medical attention and regular follow up.

(AR 397.)

The remaining medical evidence in the Administrative Record includes treatment records of various psychologists and psychiatrists from 2022 through 2024. (AR 361-372, 373-376, 377-387, 388-391, 398-420) and treatment records of audiologists from 2023 to 2024 (AR 421-422, 423, 424-433.)

Dr. Brett Valette, a licensed clinical psychologist evaluated Claimant on January 15, 2022, relying on Claimant's medical records, Claimant's statements, and information from a clinical interview. (AR 362.) Dr. Valette opined that Claimant's experience as a child in a refugee camp in Saudi Arabia and employment station in the Guantanamo Bay prison exposed him to "trauma stressors" and that Claimant's symptoms "fit the DSM 5 criteria" for both PTSD and major depressive disorder. (AR 362.)  Further, Dr. Valette noted that Claimant's "repeated exposure to trauma events has resulted in a cumulative effect . . . [that] has made his PTSD worse." (AR 368.)

Dr. Valette also described the symptoms reported by Claimant. Dr Valette explained that Claimant reported the symptoms occurred after he stopped working and included "depressed

---

[8] Claimant testified that he provided Dr. Ali copies of the prescriptions and notes and that Dr. Ali wrote the letter based on his recollection of Claimant and the information contained in the prescriptions and notes. (AR 44-45.)

6

mood, anxiety, suspiciousness, panic attacks that occur weekly or less often, near continuous panic or depression affecting the ability to function independently, appropriately and effectively, chronic sleep impairment, concentration and focusing difficulties, flattened affect, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty adapting to stressful circumstances, including work or work-like settings, inability to establish and maintain effective relationships, suicidal ideation, and neglect of personal appearance and hygiene. (AR 365-66.) Dr. Valette concluded that there was "no inconsistency in [Claimant's] reporting . . . [and] no reason or evidence to doubt his credibility." (AR 368.)

Dr. Kristina Rynes evaluated Claimant on June 29, 2023. (AR 378.) Dr. Rynes concluded that Claimant meets the diagnostic criteria for: PTSD, major depressive disorder (severe, without psychotic features), and agoraphobia with panic disorder. (AR 378.) In addition, Dr. Rynes's treatment notes, like those of Dr. Valette, reflect Claimant's experience in a refugee camp as a child and in war zones or prisons while working as a language and cultural advisor. (AR 382.) Dr. Rynes's treatment notes state that Claimant said symptoms began in 2004, including bad dreams and frequent urination. (AR 382.) In addition, Dr. Rynes's notes indicate that Claimant informed her that he managed his condition by isolating himself and taking medication. (AR 382.) Dr. Rynes's notes reflect that Claimant informed her that he previously sought treatment in Mexico, Iraq, and Kuwait. (AR 382.)  Finally, Dr. Rynes noted that Claimant had quit several jobs after 2012 due to the symptoms of PTSD. (AR 385.)

Claimant saw Dr. Caroyln Ross six times between August 4, 2023, and December 28, 2023. (AR 388-391, 398-420.) Claimant first saw Dr. Ross during an August 4, 2023, telehealth intake. (AR 417.) Dr. Ross indicated that Claimant reported he experienced "flashbacks and nightmares of war," "depression, isolating, irritability, agitation, difficulty sleeping, frequency of urination

during the night." (AR 417.) Dr. Ross concluded that Claimant's PTSD "was related to being embedded with the military . . . [and] vicarious trauma from videos of captured prisoners all from Iraqi war." (AR 388, 417.) Dr. Ross noted that Claimant quit his job in 2012 and did not seek treatment in the United States because he feared losing his security clearance. (AR 388, 417.) Claimant reported similar history of diagnosis, symptoms, and treatment to psychotherapist Carmina Lopez, LMFT, in a May 2023 "Biopsychosocial Assessment." (AR 373-376).

Claimant also attended several audiology appointments in 2023 and 2024. (AR 421-432.) He reported to one provider that his hearing loss was due to excessive noise exposure during his work. (AR 424, 426.) The medical evidence shows that providers diagnosed Claimant with severe to profound bilateral hearing loss. (AR 421-422, 426-27.) However, one doctor noted that Claimant could "continue to work . . . if he has hearing aids." (AR 426.) Although the doctor noted that Claimant reported the hearing loss began in 2003 or 2004 and the doctor noted it was "likely" that the loss started at that time, the doctor concluded "[i]t is impossible to know when the progression of hearing loss occurred." (AR 426.)

Claimant testified about the onset of his PTSD and hearing loss as well as their impact upon him. (AR 38-64.) Claimant testified that he first began hearing voices in 2009, which became worse over time, leading him to quit his job in 2012. (AR 48-49, 52.) Claimant described hearing two voices, sounding like "cockroaches," particularly when he tried to sleep, and asking him to "do things." (AR 52-53.) He testified that, beginning in 2013, the voices were in "the back of his head . . . 24/7." (AR 53.) He also testified that due to being near many explosions, he also had pressure in his ears, for which antibiotics were not helpful, and which led to hearing loss. (AR 51-53.) Claimant explained that for some time he did not realize he had hearing loss because of the presence of the voices. (AR 52.)

Claimant testified that after he quit his job in 2012, he became depressed and isolated himself because of his PTSD. (AR 50.) Claimant explained, for example, that he was engaged twice but that he broke off the engagement due to his PTSD. (AR 50.) Claimant further explained that he became very suspicious of other people and fears they may "stab" him or "hurt" him. (AR 54-55.) Claimant testified that beginning in 2016 he began to experience flashbacks. (AR 55.) He testified that in 2017 he experienced panic attacks "every other day." (AR 55.) He described his panic attacks as causing him to be breathless, unable to concentrate or speak, and being unable to remember what had happened. (AR 56.) Claimant explained that when he had panic attacks, he treated himself by removing himself from others and lying down to rest. (AR 56.) Finally, Claimant explained that he continued to experience incontinence between 2012-2017, sometimes having to urinate 30 to 40 times per night and that his symptoms were worse when he was not calm. (AR 57.)

He testified further that working around other people "bothers" him. (AR 54-55.) Claimant also testified that he sought numerous jobs between 2012-2017 but that sometimes he believed he was not hired because potential employers examined his background and because he was unable to work for more than a few days because of the symptoms of his PTSD. (AR 51-54.)

In an Adult Function Report ("AFR"), Claimant wrote:

I have growing impatience, feeling anger, can't get along with others, losing concentration, not being comfortable working with others, or teamwork interactions. My fears and emotional feeling prevent me from performing my regular job that I used to perform. I have constant fatigue due to the lack of sleep. Forgetfulness and urination frequency.

When I wake up, I feel very exhausted due to the lack of sleep. When I try to sleep at night, I start having flashbacks, fears and worries, which prevent me from having a normal restful night. Therefore, I try to take sporadic naps during the day. Sometimes drive my car and park in an isolated place.

(AR 224-225, 231.)

Claimant reported in the AFR that he has stopped engaging in hobbies or attending public events and that he has lost interest in socializing, developing friendships, or engaging with friends or family. (AR 228-231.) He reported that he wishes to be alone and isolates himself. (AR 228-231.) Claimant stated that he experiences memory loss, concentration lapses, fear of others and suspiciousness. (AR 228-231.) Finally, Claimant reported fatigue and frequent urination. (AR 228-231.)

## IV.   STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include

"anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

The "[f]ailure to apply the correct legal standard or to provide this [C]ourt with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## V.   DISCUSSION

### A.   Legal Standards Governing Determination of Whether a Claimant has a Severe Physical or Mental Impairment

At step two, it is a claimant's burden to demonstrate an impairment, or a combination of impairments, that significantly limit his ability to do basic work activities.[9] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); 20 C.F.R. §§ 404.1523(a), 416.920. A claimant must show more than just the existence of a condition or impairment. *Hinkle v. Apfel*, 132 F.3d 1349, 1352

---

[9] A severe impairment significantly limits a person's physical or mental ability to perform "basic work activities":

    (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
    (2) Capacities for seeing, hearing, and speaking;
    (3) Understanding, carrying out, and remembering simple instructions;
    (4) Use of judgment;
    (5) Responding appropriately to supervision, co-workers and usual work situations; and
    (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).

(10th Cir. 1997). A claimant must provide medical evidence that he had an impairment and of how severe it was during the time of the alleged disability. 20 C.F.R. § 404.1512(a), § 416.912(a).

Although the burden remains on the claimant to establish an impairment or combination of impairments that significantly limits his ability to do basic work activities, the burden is nondemanding, and a claimant must make only a *de minimis* showing that he has a severe impairment. *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997). "'Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking' the subsequent steps of the sequential evaluation process." *Langley*, 373 F.3d at 1123 (10th Cir. 2004) (quoting *Bowen v. Yuckert*, 482 U.S at 158, 107 S. Ct. at 2300, 96 L. Ed. 2d 119 (1987) (O'Connor, J., concurring)). Thus, step two is designed "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Yuckert,* 482 U.S. at 156 (O'Connor, J., *concurring*) (*cited with approval by Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009)). "The severity regulation is to do no more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." SSR 85-8, 1985 WL 56856, at *2 (internal quotation omitted). Further, an ALJ "may not deny a claim at step two on the basis of insufficient evidence; instead the ALJ must determine that the evidence clearly establishes that the impairment is not severe." *Sanchez v. Berryhill*, No. CV 17-543 CG, 2018 WL 1870434, at *4 (D.N.M. Apr. 17, 2018) (citing SSR 85-8, 1985 WL 56856, at *3-4).

**B.**    **The ALJ Erred in Concluding Claimant's Impairments did not Significantly Limit Basic Work Activities**

Claimant argues that the ALJ's determination that his impairments were not "severe" during the relevant time period was not supported by substantial evidence. (Doc. 13 at 11-15.) Claimant asserts that in reaching this determination the ALJ assessed his reported symptoms using

12

Paragraph B, which would more appropriately be "applied during the listing assessment at step three." (Doc. 13 at 11.) Further, Claimant argues that although the ALJ acknowledged Dr. Ali's medical opinion, he did not "apply the regulatory factors required by 20 C.F.R. § 404.1520c, for determining the persuasiveness" of that opinion. (Doc. 13 at 11.)  Finally, Claimant argues that (1) the ALJ failed to give proper weight to the opinions of all of the providers who treated him during 2023 and related their opinions back to the relevant time period. (Doc. 13 at 11-15.)

I find that Claimant's motion is well taken and recommend, for the reasons below, that the Court remand this matter to the ALJ for further proceedings.  Specifically, I find that the ALJ applied an incorrect legal standard to conclude that Claimant's impairments did not significantly limit basic work activities.  I also find that the ALJ ignored significantly probative evidence or mischaracterized evidence and thus the decision is not supported by substantial evidence.

1.  <u>The ALJ did not apply the Proper Legal Standard</u>

Although the burden rests on Claimant to show the existence of a severe impairment at step two, a claimant must make only a *de minimis* showing that he has a severe impairment. *Hawkins*, 113 F.3d at 1169. The severity requirement exists only to eliminate claims where the alleged impairment cannot possibly meet the statutory definition of disability." *Yuckert,* 482 U.S. at 156 (O'Connor, J., concurring). More, if the evidence is unclear as to whether the impairment is severe, the sequential evaluation process should nevertheless be continued. *See Richard P. v. Dudek*, No. 24-CV-870, 2025 WL 1135616, at *5 (D.N.M. Apr. 17, 2025); *Sanchez*, 2018 WL 1870434, at *5.

The ALJ gave lip service to the regulation's definition of a "severe impairment," noting in several places that a severe impairment is one that "significantly limited the ability to perform basic work-related activities for 12 consecutive months." (AR 21, 23-27.) However, in discounting the severity of Claimant's impairment, the ALJ characterized Claimant's burden differently. For

example, the ALJ found that Claimant's allegations were inconsistent with "incapacitating mental symptoms." (AR 25.) Similarly, in discussing Claimant's alleged urinary incontinence, the ALJ found that the medical records contained "benign evidence [that was] not consistent with *unmanageable* urinary frequency or incontinence symptoms from 2012 to 2017. (AR 25 (emphasis added).)

A claimant's physical impairment need not rise to the level of "incapacitating" or "unmanageable" to be severe; instead, claimants must merely show that the symptoms of the impairments were not so mild that they could not possibly meet the step two *de minimis* showing of severity. *See, e.g., Bowman v. Massanari,* No. 98-CV-1252, 2001 WL 37125031, at *6 (D.N.M. June 29, 2001) (finding that a medical doctor's diagnostic impression describing depressive symptoms met the step two *de minimis* showing of severity); *Sanchez*, 2018 WL 1870434, at *5 (finding error where ALJ required claimant to show "such overwhelming symptoms sufficient to be declared disabled prior to the date last insured"); *Chavez v. Berryhill*, No. 16-CV-1376, 2018 WL 1224447, at *3 (D.N.M. Mar. 8, 2018) (noting that a claimant need not show impairment precluded sustained work rather than the *de minimis* showing of something more than minimal interference with work activities); *Hinkle*, 132 F.3d at 1353 (noting that the "significant limitation" prong of §12.05C parallels the step two analysis and that it requires "something less than a preclusion from any substantial gainful employment."); *Yuckert*, 482 U.S at 158.

The ALJ thus did not properly apply the proper legal standard to determine whether any of Claimant's medically determinable impairments "significantly limits his ability to do basic work activities." (AR 23-27.) Instead, the ALJ held Claimant to a higher burden than required at step two of the analysis suggesting that they were not severe because his impairments were not incapacitating or did not produce unmanageable symptoms. (AR 23-27.) The ALJ's failure to apply

14

the correct legal standard to determine whether Claimant's impairments were "severe" at step two provides sufficient basis for remand. *Jensen v. Barnhart*, 436 F.3d at 1165; *Hamlin*, 365 F.3d at 1214; *Fowler v. Comm'r, Soc. Sec. Admin.*, No. 17-CV-1622, 2018 WL 2455054, at *4 (D. Colo. June 1, 2018) (remanding case where ALJ failed to apply *de minimis* standard at step two).

2. The ALJ's Opinion Ignored Significantly Probative Evidence or Mischaracterized Evidence

In making a determination regarding eligibilty, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The record must "demonstrate that the ALJ considered all of the evidence" so that a reviewing Court may determine the basis for the ALJ's decision and conduct meaningful review. *Id.* For the reasons herein, I recommend the Court find that the ALJ did not consider all the evidence, including records from 2014 from Dr. Ali, who treated his PTSD and depression, and providers who treated Claimant after the date last insured.

First, although the ALJ briefly described Claimant's 2014 treatment with Dr. Ali, he does not mention Dr. Ali's 2023 letter that related back to his 2014 treatment and described the symptoms Claimant reported and outlined a treatment recommendation. (AR 25, 397.) Instead, the ALJ only briefly summarized Dr. Ali's diagnosis and prescribed medication, finding that Dr. Ali diagnosed "PTSD and major depressive disorder" and "treated [Claimant] with Amitriptyline and Zoloft." Because the administrative record contains few objective medical records regarding Claimant's impairments between 2012 and 2017, the information contained in Dr. Ali's records and his subsequent recollection of Claimant captured in his 2023 letter provide the only medical evidence directly related to Claimant's PTSD and depression prior to the date last insured and thus a careful evaluation of that information is critical.

The ALJ also stated that "Dr. Ali's records did not include any mental status findings." (AR 25.) Contrary to the ALJ's conclusion that Dr. Ali's records did not include mental status findings, Dr. Ali begins the 2023 letter summarizing his treatment of Claimant by stating that Claimant "*presented . . .* in May 2014 with severe symptoms of major depressive disorder." (AR 397 (emphasis added).) Dr. Ali goes on to describe the symptoms reported by Claimant to include: "low mood, lack of energy, sleep disturbances, isolation from other people loss of weight disturbed memory, hopelessness and helplessness, feeling of generalized anxiety and integration difficulty with his environment accompanied with urine incontinence." (AR 397.) Dr. Ali both prescribed Claimant medication to treat these symptoms and outlined a recommended course of treatment, noting that Claimant required "need[ed] continuous medical attention and regular follow up." (AR 397.) Although the ALJ recognized Dr. Ali's diagnosis and the medication he described he did not discuss Dr. Ali's recollection that Claimant "presented" with severe symptoms or identify the symptoms Dr. Ali described in his letter. (AR 23-27.)

Although Dr. Ali's record of treatment and letter are sparse, the information in his records and letter evidence shows Dr. Ali found that Claimant *presented* with severe symptoms and then described those symptoms. At step 2 of the analysis, where Claimant need only make a *de minimis* showing that he had a severe impairment, the ALJ's failed to discuss significantly probative evidence in glossing over the information in Dr. Ali's treatment record.  *See Victory v. Barnhart*, 121 F. App'x 819, 825 (10th Cir. 2005) (ALJ's failure to discuss treating professional's records was clear error); *Petties v. Colvin*, No. 14-CV-292, 2015 WL 5713882, at \*3 (W.D. Okla. July 31, 2015), *report and recommendation adopted,* No. 14-CV-292, 2015 WL 5725705 (W.D. Okla. Sept. 29, 2015) (noting ALJ's failure at step 2 to consider or discuss reasons for rejecting a doctor's physical residual functional capacity assessment, given lack of other medical evidence, violated

16

controlling legal standards); *Kingsley v. Barnhart*, No. 02-CV-467, 2004 WL 7338218, at *4 (D.N.M. Feb. 12, 2004) (holding that medical finding discussing impacts of a claimant's mental impairments was significantly probative evidence that must be discussed at step two).

In addition, as Claimant points out in his motion (Doc. 13 at 11-15), Dr. Ali's recollection of Claimant's condition and symptoms in 2014 are consistent with the findings of treating and consulting providers who saw Claimant in 2022 and 2023, who opined generally that Claimant's background, living in a refugee camp and working in war zones, led to his PTSD, depression and accompanying symptoms prior to the date last insured. The ALJ either mischaracterizes or fails to discuss the opinions of Claimant's providers, which support Dr. Ali's opinion.

For example, Dr. Valette stated that "repeated exposure to trauma events has resulted in a cumulative effect" that triggered Claimant's PTSD. (AR 361.) Dr. Valette also noted that Claimant "suffered [PTSD] while working on the job as a contractor," thus opining that Claimant's PTSD originated between 2009 and 2012. (AR 369.) Dr. Valette also described symptoms that Claimant reported he experienced after he quit working in 2012, including anxiety, self-isolation, trouble sleeping, urinary incontinence, panic attacks, and hypervigilance. (AR 362-368.) Dr. Valette opined that there was "no reason" to doubt Claimant's credibility. (AR 369.) Contrary to Dr. Valette's finding that Claimant's self-report of his previous symptoms was credible, the ALJ dismisses Dr. Valette's opinion without explanation as "not otherwise supportive of the Claimant's allegations and symptoms and limitations during that period given its remoteness from the relevant period." (AR 27.) An agency's reasoning is not supported by substantial evidence where it is incorrect. *Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir. 2012).

In addition, the ALJ's opinion does not discuss the findings of other providers who, like Dr. Valette, also allude to the origins of Claimant's PTSD and depression and the resulting

17

symptoms. Dr. Rynes, for example, noted that Claimant had quit several jobs due to the symptoms of PTSD. (AR 385.) Dr. Ross concluded that Claimant's PTSD "was related to being embedded with the military . . . [and] vicarious trauma from videos of captured prisoners all from Iraqi war." (AR 388.) Dr. Ross also noted that Claimant quit his job in 2012 and didn't seek treatment in the United States because he feared losing his security clearance. (AR 388.) Although Dr. Rynes and Dr. Ross do not make explicit retroactive findings about Claimant's symptoms, their opinions that Claimant's PTSD originated because of his experience in a refugee camp and as a contractor with the U.S. Army in war zones are consistent with Dr. Ali's finding that in 2014 Claimant "presented" with "severe symptoms" related to PTSD and depression and with Dr. Valette's opinion that Claimant's report of symptoms he experienced prior to the date last insured were credible. Given that the findings of Dr. Rynes and Dr. Ross are consistent with the findings of Dr. Ali and Dr. Valette, they constitute significantly probative evidence that the ALJ was required to consider. *Clifton*, 79 F.3d at 1009-1010.

In addition, the ALJ also did not accurately describe other evidence in the record. First, the ALJ overlooked medical evidence related to Claimant's urinary incontinence. (AR 25-26.) The ALJ stated that Claimant received treatment for urinary incontinence only in 2011 and 2012, ultimately being diagnosed with an "overactive bladder" and did not seek further treatment after the 2011 and 2012 examinations. (AR 25-26.) However, the ALJ neglects to discuss records that show Claimant continued to receive treatment for this impairment in 2014 from Dr. Kafaji, who prescribed medication to treat the impairment. (AR 395-396.) The ALJ's conclusion that Claimant received treatment for his urinary incontinence only in 2011 and 2012 is factually inaccurate.[10]

---

[10] Furthermore, I note that the ALJ's analysis of Claimant's urinary incontinence focused on the impairment as solely a *physical* impairment and not a symptom of his PTSD and depression. Dr. Ali opined that Claimant's "urine incontinence" accompanied his general anxiety and ability to integrate in his environment. (AR 397.) Dr. Valette also noted that Claimant reported that doctors informed him that his

*Harriet S. v. Berryhill*, No. 17-CV-152, 2018 WL 4466048, at *3 (D. Utah Sept. 18, 2018) (finding

error at step 2 where ALJ overlooked ongoing treatment for incontinence).

The ALJ also mischaracterized the evidence related to Claimant's attempt to obtain

treatment for his psychological impairments. Throughout the opinion, the ALJ relied on a

purported absence of treatment to conclude that Claimant's impairments were not "severe."[11] The

ALJ stated that Claimant's statements about his symptoms were not "consistent with the limited

treatment," that the "limited evidence of treatment [was] not consistent with significant

limitations," that Claimant's lack of treatment for urinary symptoms after 2017 suggested

"minimal symptoms" during 2012-2017, and that "the evidence shows no other mental health

treatment" between 2012-2107 other than Dr. Ali's treatment in 2014. (AR 23-27.)

Contrary to the ALJ's conclusion that Claimant did not seek treatment for his impairments,

Claimant testified at the hearing both that he sought treatment in several countries and that there

were not medical records of those treatments because of the recordkeeping practices in those

countries. (AR 44, 48-49, 58, 163). Claimant also testified that he was reluctant to seek treatment

because it may impact his security clearance. (AR 48-49, 163.) Finally, Claimant reported to his

---

urinary incontinence was a psychological issue and not a physical one. (AR 363.) On remand, the ALJ must consider the combination of Claimant's impairments, *Langley*, 373 F.3d at 1118, including the suggestion that Claimant's urinary incontinence is a physical symptom of his PTSD that may have significantly limited his ability to perform work activities.

[11] I note that, even if correct, in so relying, the ALJ applied an incorrect legal standard because a lack of treatment, particularly for PTSD or other mental impairments, is not a proper basis for ignoring other record evidence in assessing the severity of the mental impairments at step two. *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010); *Lee v. Barnhart*, 117 F. App'x 674, 681 (10th Cir. 2004) (reversing agency decision in part because the ALJ relied on claimant's lack of treatment where the record showed that claimant could not afford treatment); *Freidenberger v. Colvin*, No. 14-CV-2337, 2015 WL 3395770, at *5 (D. Colo. May 26, 2015) (collecting cases). In addition, where there is evidence in the record that explains a claimant's absence of treatment, it is improper for the ALJ to rely on the absence of treatment without considering that information. *Lee*, 117 F. App'x at 681.

providers that he sought treatment in other countries. (AR 382, 417.) Although the ALJ correctly noted that there were no records of the treatment described by Claimant, the ALJ did not conclude that Claimant's testimony about having sought treatment was not credible, (AR 23-27), and thus any statement that Claimant did not seek treatment prior to the date last insured is not supported by substantial evidence.

The Agency's reasoning is not supported by substantial evidence where it is incorrect. *See Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence where it was belied by a letter in the record); *Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir. 2012) (agency's reasoning was not supported by substantial evidence where it was "incorrect"). Here, the ALJ incorrectly described the medical evidence related to Claimant's pursuit of treatment related to both his urinary incontinence and his psychological impairments and thus the opinion is not supported by substantial evidence.

## VI.    CONCLUSION

In sum, the ALJ erred in two ways, neither of which are harmless. First, the ALJ applied a more onerous standard at step two than the required *de minimis* standard. Given the ALJ's statements that there was not evidence that Claimant's condition was "incapacitating" or "unmanageable," the Court cannot find that the ALJ would not have reached a different conclusion had he applied the correct legal standard and required Claimant to establish only that his impairment was not so slight that it did not significantly limit any 'basic work activity. This first error was compounded by the ALJ's failure to consider and accurately describe all the medical evidence. Notably, the ALJ characterized the medical evidence of Claimant's psychological impairments as consisting only of a diagnosis and accompanying prescriptions. However, Dr. Ali and Dr. Valette both opined that Claimant suffered symptoms of his PTSD and depression prior to

the date last insured. The ALJ did not describe these symptoms identified by Dr. Ali or Dr. Valette and thus did not consider whether they, individually or collectively, significantly limited Claimant's abilities in any basic work activity. Similarly, the ALJ's inaccurate description of Claimant's course of treatment, for both his physical and psychological impairments, is not harmless. The ALJ concluded that Claimant's impairments were mild based largely on an inaccurate conclusion that the record did not establish that Claimant had sought treatment for his impairments during the alleged period of disability. The ALJ may have reached a different conclusion had the ALJ accurately described the treatment Claimant received.

Accordingly, I recommend the Court GRANT Claimant's motion, reverse the Commissioner's decision denying benefits, and REMAND this matter to the Commissioner for further proceedings consistent with this opinion.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**